In this case, the BIA affirmed the immigration judge's decision without an opinion. Therefore, the court reviews the immigration judge's decision. The immigration judge specifically found the petitioner to be minimally credible. Therefore, under the present decision in this court, the petitioner must be deemed to be credible with the consequences attached to that determination. Accepting the petitioner's testimonial and documentary evidence as true, the court is compelled to find that the petitioner has established that he is eligible for asylum based upon his wife's two involuntary abortions and one involuntary sterilization. Now, the issue confronting the court is whether or not the matter of J.S. applies here. We would submit to the court, Your Honor, not to apply the matter of J.S. in this case because it raises a serious constitutional issue. Because when the petitioner was preparing his asylum application and when the petitioner was presenting his asylum claim before the immigration judge, he had no way to anticipate the change of law. So the matter of J.S., if it applies in this case, would be changing the rule in the middle of the game. So therefore, it raises a serious constitutional issue because I believe the petitioner's due process rights would be greatly compromised if the court applies the matter of J.S. in this case. In addition, Your Honor, the court has held that it would not give deference to agencies' interpretation of the law if congressional intent is clear. That's a case in Beltran-Tirado versus Agnes is 213-3-1179. It's a year 2000 case. To ascertain the congressional intent, I think the most reliable, short of plain statutory language, the most reliable source would be from the legislators themselves. I believe in the matter of J.S., the attorney general made a reference to a brief submitted by Representative Smith and Hyde in support of keeping the per se rule intact. So therefore, the court should not accord any deference to the agency's interpretation as the attorney general articulated in the matter of J.S. I think even though, even if the court applies the matter of J.S. in this case, I would submit to the court that the petitioner has met his burden of proof that he is eligible for asylum. First of all, petitioner has resisted the coercive population control programs in China. And he, in violation of the birth control policies in China, he attempted to have a third child after his wife gave birth to two daughters. Moreover, for his wife's second abortion, petitioner went to the local officials and actually told officials and asked officials for leniency because the couple really wanted to have a son. So by pleading with officials to help him keep the pregnancy, the unauthorized pregnancy, petitioner has resisted, at least passively, to the birth control policy in China. Now, as a result of petitioner's resistance, petitioner suffered past persecution. And this past persecution is the cumulative effects of loss of his own unborn child, actually children, because his wife underwent abortion twice, as well as involuntary sterilization. So if the court looks at the cumulative effects of two abortions and one sterilization, the petitioner has clearly demonstrated that he suffered past persecution. So therefore, the court should reverse the BIA's decision in denying the petitioner's asylum application. And that's all we ask for the court to do. And if the court, I don't have anything else to add. And if the court has questions, I'm more than happy to answer them. Thank you, Judge. I will reserve my time for questions. Thank you. May it please the court, John Blakely on behalf of the Attorney General of the United States. In this case, Mr. Zhao had three different opportunities to present his asylum claim to the United States. The first was before the asylum officer, and then he had a chance before the immigration judge and before the board. On all three levels, he failed to establish his eligibility for asylum. It was his burden of proof, and he failed. He failed for pretty much three different reasons. This case is all about force. And whether or not his wife was... Was this force more than physical force? Certainly, Your Honor. Under the case law here in this circuit, it also includes moral and financial coercion. But here, we don't have evidence of that. And there's three primary flaws that lead to that. If there had been a threat of discharge, would that have been force? I'm sorry, I don't understand the discharge. If he were made aware that he would be discharged from employment, the government would force him out of a job. Would that be enough? By itself, I don't think the board has faced that decision. It's the board that would have to make that... The board that would have to reach that conclusion. I'm not sure that it would be enough standing by itself. And it's important to note, in this case, we don't have that situation. But when you say it wouldn't be enough, I would question whether it's not just a single discharge from a single job. If there's a government policy that you're violating, it wouldn't seem to effectuate the government's intent to say, well, you can't have this job, but you just go to the next employer and get the next job. I would assume, under these conditions, that a discharge would mean that you wouldn't be able to have a job, at least for some time. Well, the facts aren't clear. The record's not clear on exactly how... I'm trying to find out what... Because you were saying that what you need is force. I'm trying to find out what that means in the government's view. Well, the best way for you to... If you're forced out of employment and barred from getting any other employment for a while, that would be force? Your Honor, it's the board. It's not me that has to address that in the first instance. Okay, but it's the government's position in this case we're interested in. You advocate for the board. What's the government's position on what the meaning of economic coercion is in this context? Well, it would certainly have to be a compelling case that it was going to... Economic force to the level that would sacrifice your life for liberty. And it doesn't get to that point in this case. In fact, we don't even establish... I think that Reinhart and I have probably the same question. What do you believe the contours are of economic force in the context of these kind of things? Is it firing? Is it prohibition of getting another job? Is it loss of any economic opportunity? I don't have that. Maybe the best way to answer that question is to compare this case to other cases in which this court has held that it is sufficient force. It is sufficient to establish that it's been forced. In Wang, for example, we had a woman who was forced, and this court found that she had been forced, when she did lose her job. And she was in the immigration court to testify that she had lost her job or that she would lose her job if she didn't have the abortion. In addition to that, she was a member of the Han majority. She was not an ethnic minority. So it's clear that the policy in that case was against her having more children. Here, we don't have that. We have an ethnic Korean who lived in an extremely lower province, the Jilin province, where in Jilin they even allow unmarried women to have children and legally have children in certain circumstances. That's the context in which we look for whether or not there was force. I don't see whether they have the minority. I don't think the report in that province is particularly helpful because it was clear that the political leaders of that province were very much against her having more children. It is true that they were against it, but exactly how they related that opposition to her is unclear because at no time when those leaders were talking to Mrs. Zhao was Mr. Zhao there. So everything that the immigration judge had before her was hearsay evidence. And it wasn't even very detailed hearsay evidence. It was just they influenced, and well, exactly how they influenced, and he didn't have anything more. And so it could have been to the point of, hey, it's legal for you to have another child if you want, but hey, give us a hand here because we're going to run into problems with our numbers if you keep having children. And does that mean that she would have lost her job or that he would have lost her job? That's not clear from the record. It hasn't been established here, and that's what we're talking about today. I'd like to be able to give the board statement on exactly where that line is when it's just the loss of a job, but the board hasn't faced that, and I'm not able to answer that. Instead, I can say, well, in this case, when I compare it to other situations that have been before this court and before the board, this doesn't rise to the level. And there's one other reason besides the two, the ethnicity that I talked about and the hearsay evidence that I talked about. Mr. Zhao himself testified on two different occasions that he wasn't sure what would happen if she hadn't gone in for those abortions. So right now, as I stand before you, I'm telling you, we're not sure what would have happened, and he's not sure, and so that's substantial evidence to support the immigration judge's decision. What's the best evidence in the record that ethnicity is a factor one way or the other in this case? It's the State Department country reports, Your Honor, which was never disputed by Mr. Zhao in this case. There's no direct testimony about the ethnicity was a factor one way or the other in this case, right? Not that I know of, Your Honor. But so that evidence was never refuted. Additionally, we have this situation. Your Honor, what are you supposed to do in a country where you know they've got a policy and the government keeps coming around to you and says, you better get an abortion, and you don't do it for a while, and then they come and they keep coming to your house and say, you know, you better do it or else. What do you have to do? Say to them, does all else mean that I go to prison, I lose a job? What are you going to do to me? Your Honor, that's exactly the immigration judge's question, because that's not clear on this record, because he doesn't... Well, it's not on this record, but I mean, how would you ever get that in the record? I mean, of course, is that what you're supposed to do to make a record? Is that what you're supposed to say when there's, you know, in a dictatorship or a country where they persecute people? I understand it's difficult. In this case, Your Honor, what I would have expected, something similar to what happened in Deng and Wang and Tang and other cases that this Court has faced that question, and that was they received testimony. In those cases, it was the woman herself. She testified, this is exactly how I was forced. In this case, what I would have expected, what I would have prepared if I was the attorney, was an affidavit from Mrs. Zhao that says, this is the exact way in which this force was applied to me. That wasn't available in this case. She did provide a very brief letter to the Court, but that letter even contradicted what had already been entered into evidence. She said that she was employed in a certain place and she would have lost her job. When Mrs. Zhao testified, Mrs. Zhao testified that she didn't have a job at the time. So I'm just assuming that that was some sort of prediction of what might happen in the future if she hadn't gotten the sterilization and she had then gotten pregnant again, but that's not the question that we're faced with right now. We're faced with the question of whether she was forced at that time. She didn't have a job in 2002. So she couldn't have, she couldn't use the threat, the government could not use the threat of taking away her job. This case is different than I've seen in the past in that the petitioner here is the husband, and he seemed to be sort of disjointed from the wife. Apparently the job market or whatever forced him to be out of the home, if you will, in a way. So it seems so the evidence was sort of secondhand, but he's relying upon the wife's position of being forced into an abortion. And it sounds like what you're saying is that in order for him to do that, the evidence of the wife wasn't sufficient here. And it was hard because of what he was trying to do. He's never connected up with her. He wasn't there when she had the abortions. And for some reason there was some mystery about his idea of what the abortions were all about or whether she voluntarily went in. I had a hard time with that. You're exactly right, Your Honor, and I shared the same problem when you started. But some of that, I think, was because of translation as far as whether it was a natural miscarriage or an induced miscarriage or what. Some of that was unclear. But one thing about the pressure or the inducement to say, you're going to have it before the abortion was done, because he's not there. And the evidence he brought in was very difficult to follow about what he was claiming happened to her. He wasn't there. That's correct, Your Honor. And we don't even know how many times they went or exactly how that forced. And that's the problem here is that he has to establish that the evidence compels a different conclusion than that reached by the infertility judge. Well, there certainly was evidence that the local authorities were against this. They did not want her to have these children. There certainly was evidence of that. But then the question is, how did she react? I mean, I suppose the story would be if the government comes and says, I want you to have an abortion, and you say, okay, I give up. That's a different story. I found evidence here in the record of the authorities putting the pressure on, but I had a hard time on the end to figure out how the wife responded to that pressure. I agree with that, Your Honor. He does say, I mean, the question was, you and your wife wanted to have a third child. Why did your wife consent to the abortion? That was because of the leadership influence. And he goes on to say, why didn't your wife decide to keep the child? Well, under the advice, numerous advice of leadership, even though he didn't want to go for it, was on to the point of leadership. I realize it's general, but she did testify that that was the reason that she had the abortion, or he testified that that's the reason she had it. And that testimony was deemed credible. It was deemed credible, but it was found to be general, and the question is whether or not it was sufficient to meet his permit. Well, that's where I started. I mean, they kept coming to her house and telling her, you better do it. And what did she have to say to them? She has to say, if I don't, are you going to execute me? Are you going to put me in prison? Are you going to take away my employment or my husband's employment? Is that what the person has to do when in a, I don't want to keep saying a dictatorship because so many countries are dictatorships. But when the government comes around like that and threatens, that's who you're supposed to ask them what specific consequences will there be for my disobedience to government policy. Well, Your Honor, there's no specific requirement for what exactly that individual is, what is demanded of them. But what is expected, at least in the immigration court, is that it will be established what was said. And here we don't know what was said, nor do we know how many times. We don't even know whether this was once or twice or three times. We don't have the answer to that, and those are answers that we need in order to grant asylum. I thought it was clear from the record they came around numerous times or a number of times. I'm not sure whether those number of times were once in 1993 and once in 2002. That's unclear from the record, Your Honor. He specified he didn't know what would happen to him in terms of his job employment, but similarly situated people had been fired. That's the gist of it.  He did not mention whether those were other ethnic Koreans or whether they were members of the Ha majority, and he also didn't mention whether that was in Jilin or whether that was somewhere else that he had worked. It says, do you know somebody else? Others, some like me, have been dismissed. Do you know somebody who got dismissed because their wife's refusal to go into abortion? Is that right? Answer correct. Did your wife fear the same thing would happen to you if she had not gone into an abortion? If you know, yes. How do you know? She told me. And it's possible that if any one of the three of you were in the immigration judge's position, you might have reached a different conclusion, but that's not the question here. The question is whether the record evidence compels the conclusion that force was used for this abortion or this sterilization. I'm just asking you to comment on the evidence that's there. We're obviously familiar with standard review. We can review thousands of these cases. Right, yeah. In this case, it's just not clear exactly what was said to her and how many times she was visited and exactly what way she was forced. There are indications that there was influence, but we don't know what influence means in this case. I notice my time's up, Your Honor. I haven't had a chance to address the matter of JS in any way. Is this correct? Even as the court establishes that this was sufficient force in this case under a matter of JS, this claim necessarily fails. But the IJ didn't apply a matter of JS, right? That's true, Your Honor. But it forecloses. The board didn't apply a matter of JS, right? That's correct, Your Honor. So if we want to have the board analyze a matter of JS, we'd have to remand for the board's consideration the first instance, wouldn't we? I don't think that's necessary in this case, Your Honor, because that's the same argument that petitioners often make to us. And the government always says, Ventura, you can't analyze that in the first instance. You've got to send the case back to have the BIA decide. But the way it's different in this case is the court or the attorney general's decision in a matter of JS says there's no way that he can establish per se eligibility for asylum if he bases it on a spouse's marriage. He's saying that we've had sort of similar situations with the situation at first. The government always says, well, that may be so, but it's up to the board to hear the case in the first instance if we're going to apply a new analysis. But I think to some extent, you know, to some extent it's different when the attorney general says we foreclose that complete line of eligibility. Under these two factors, a spouse cannot. And so if those are the factors under which the claim was made, then there's no reason to send it down below to have the board say the attorney general removed these two factors and made it so there's no longer a possibility. Well, what two factors do you think the attorney general removed? If it could be per se, right? Per se. One being the forced abortion, the other being forced sterilization, Your Honor. I'm not making a per se argument here. I'm sorry? I'm not making a per se argument here. He's not making a per se argument here. Yes, he is, Your Honor. He's saying that because his wife was, her pregnancy was forcibly aborted twice and because she was forced to be sterilized, that he, therefore, is per se, is eligible for asylum. And that's the claim that can no longer be made. Well, you don't say that a husband can't be eligible for asylum. Not in the absolute sense, but in order to establish eligibility. I don't know what that would mean per se. It means husbands are still eligible for asylum. Yes, Your Honor. But not every husband. Some husbands are. Some husbands, if they are able to establish persecution on account of other resistance. And in this case, there's absolutely no... What's other resistance? I don't understand what that means. When should a husband be eligible for asylum when he's not per se? When he establishes other resistance and that he was persecuted on account of that other resistance. Whether it's... Other resistance to his wife's abortion? Yes, that's correct, Your Honor. You're supposed to go down and picket? I don't understand what you mean, go down and picket. What it does mean, though, it means that he would have to establish that he somehow opposed it. Whether it was standing up in front of the family planning officers and saying, I will not allow you to abort my wife's pregnancy. Whether it's picketing. That's not yet established. But in this case... We don't know whether the threat to fire a husband, according to the board, would be enough to meet the standard of JS. That's what he's saying. That's the gist of his claim, and we may argue about whether it's sufficient or not, even under our case law. But JS is not making a per se claim. Maybe he is in part, but he's saying, I was threatened. My wife told me I was going to be fired if I had the abortion, and I'm the sole income producer for this family. But he said on two different occasions that he did not know what was going to happen to him. Well, how does anybody know? How does anyone know what's going to happen? You want to test this. He said they were going to put me in jail. I had to go to court. Well, Your Honor, I think the problem is that if you extend the argument that you're making right there, if somebody decides I'm not going to get pregnant because I might have a forcible abortion because there's a policy and I already have a child, then that's the same level of compulsion. In matter of JS, the attorney general says specifically that it's not so broad that any resistance, that other resistance does not mean living in a country where there's a course of policy. Right. I'm just saying, you're saying, well, the evidence doesn't show that in this case. I don't think the board decision doesn't go that far. And what I'm saying is, look, if you're going to apply, if it gets to the matter of JS analysis, we've got to send it back. And you're saying, well, no, because the evidence is weak here. But if you look strictly at JS, they're saying no per se. It's fine. He's not making a purely per se argument. I think on that, I disagree with you, Your Honor. But I think he was the only one. He's going to lose his job, that he's going to go to jail, if you're not trying to put in evidence that he's going to be persecuted or was persecuted. Now, you may argue about the significance of that, and I grant you that. But it's not a purely per se argument. But under the argument you're making, Your Honor, I don't understand. I'm not making any arguments. Well, I mean, under the point you're making, Your Honor, I don't understand what the other resistance is. He never participated in the decisions that she made, whether or not to have the words. He didn't even participate. He found out after the fact. The matter of JS wasn't on the books then. If you could smack him, remand him, he may well say, well, look, I didn't know I needed to put on this kind of evidence, and I'm going to offer this evidence on a motion to reopen. But what he did offer is that he didn't know until after the fact on either the forced abortions or the sterilization. Either the abortions or the sterilization. Sterilization was done in conjunction with the second abortion. That wasn't in the evidence. There's nothing on the record at all that indicates that there's other resistance, because he didn't actually do anything to resist. He didn't do anything to present that he was opposed to the policy. Right. But, you know, you take his preparation of these cases in light of the case law at the time. He's arguing now that if we want to apply a matter of JS, it raises a constitutional issue because he didn't have notice. Now, if we reach your argument, we have to go to his. What evidence would you put on? And the only answer to that is to remand and see whether to abort it. I'm just saying that it's a little late in the game to start saying that matter of JS is a trump card we have to apply without knowing the contours of what it means. But the other resistance argument was available to him at the time. If that, in fact, existed, he had the opportunity to apply that. That's not the part of the law that's changed. So it's different from Ventura when the government argues that, look, well, if the game has changed now, we need the opportunity to present our evidence on remand. Aren't they in exactly the same position the government urges us when it appears that we could grant outright and the petitioners are just to grant outright and say, no, the government has a chance to put on its case. Ventura requires a listening event. I think what's different in this case is that what you're asking us, what you're suggesting as far as a remand to seek more evidence, that evidence, he was on notice that he could have provided that evidence. And this is the reason I say that. You know, this business of what the evidence is, it's almost incomprehensible. I mean, you said that he wasn't there when it happened. You didn't know whether they came to the house only once in one year, once in another. You may be right, but I can't really tell. So she gave her consent. Is that what you're saying? Yes. Then he said in 2002, the chairman of the street committee came to the house when you were not there. Yes. And your wife had an abortion at that time. Well, after it went through many, many times of influence, then she went by for your husband and this kind of thing. Okay. Judge to interpreter. I couldn't understand what he said. After many times of what? Of influence. Influence. Then comes the lawyer. Influence. Judge to interpreter. Oh, influence. All right. So the street committee will come to your house to talk to your wife. Is that what you're saying? Many times. Well, many times, but a set number bench? No, because whenever I returned home, she would tell me. Okay, and then she went to the hospital. How did she get the home we got? Because I know we ride on a bicycle. But it's, you know, I don't know what that means, but it's certainly not what you are saying. It means many, many times they came and tried to have influence on her. And she would tell them at night that they came. Yes. Yes. Whatever that means, it doesn't mean that he was the way he didn't know what was going on and that they only came maybe once a year. Well, it's unclear exactly what it means, Your Honor. And if it is unclear, then he fails to meet his duty. Well, I think it's unclear because, as the judge said, I don't understand to the translator what it is he's saying. You know, I'd like to say that whatever, what's the house bench, whatever that means. Your Honor. It was a translation problem as well as everything else, but it's clear enough that they came repeatedly to the house and that he knew about it. And that in spite of knowing about it, he didn't do anything about it to show that he resisted. And in addition to that, to the extent that anything is unclear, he was represented by counsel here. And counsel certainly had the opportunity to ask additional questions to clarify if he thought that that was necessary in order to meet his burden. And he didn't do that in this case, Your Honor. And to go back to another question that was asked about J.S., the difference here between the arguments that we have and the arguments that might have been remanded before is he, the alternatives that he had were on the books for other resistance. He knew that was there. That was part of the law. When you say it's different, it's really not. Because what happens in the other cases, the government says, we'd like the opportunity to put on change of country conditions. And obviously the government knew in the first instance it could put on evidence of change of country conditions at the first hearing. They want a second bite at the apple. And under Ventura, we give the government a second bite at the apple, even though they're on notice of what the law is. Could have done it in the first hearing. What's different about this? What I'm saying is because it's the petitioner, it's not the government. Isn't it, aren't you? That's the only difference. I'm not sure exactly what those other situations are, Your Honor. I gave you a specific one, change of country conditions. The government comes up and we grant relief on the asylum claim. And the government made that argument in Ventura, that we want the opportunity to put on evidence of change of country conditions. Now, that obviously is in statute. The government is on notice of that. Could have put on the evidence. And under our case law in the Supreme Court, we send it back for the government to present new evidence on an issue that it could have presented the evidence on the first time but chose not to.  I'd have to look into that more closely, Your Honor. And I can provide supplemental briefing on that issue if you'd like me to. But, I mean, the whole idea is notice and fairness of the parties. And what their argument was this morning is, look, if you're going to apply, as the way I understood it, if you're going to apply JS, then we want to put on more evidence. And your argument was, well, they could have. They were on notice. But there's really no difference in those two cases. And I'm not here to argue with you. I'm just saying that just understanding all these cases. I have a question on that JS issue. If he was given an opportunity to bring in further evidence, would that just contradict the evidence he's already in the record with to satisfy JS? In other words, would he have to come up with a whole new factual basis that would contradict the factual basis on the record now? Well, to the extent it contradicted it, it would certainly affect his credibility. And so it would be denied on that basis. Well, whether it would be denied or not, he'd have to come up with some more different facts, which may contradict what he's already testified to. Is that right? To be honest, if he provided additional detail, it might rise to the level. With the facts that he put in the record, there's no indication at all that there's other resistance of any kind. Whether that's because he decided to have similar ones. It doesn't add anything. It only takes things away. Right. It adds a level of coercion he's got to show. So he'd have to show through testimony that when, for example, the leaders came over his house, he objected to the policy. He did something to object to the policy, right? Well, in that sense, Your Honor, yes, it does. I mean, that's the kind of evidence that he would have to put on. And in this case, we're on remand. Right. But the reason it adds it is that he no longer has the per se eligibility. Right, right. Yes. All right. Thank you very much. Thank you, Your Honor. Your Honor, I just want to address two issues. And one is that I think in this case, the evidence is clear about the involuntary, forcible nature of the sterilization. And by saying that, we just needed to look at the wife's reaction after she had the sterilization operation. And she told a petitioner at the hospital that she was sorry for being unable to give birth to a son, and they could only talk about the possibility of having a son in their next life. And also, Your Honor, I believe you could... Yes, he did, Your Honor. For the second abortion, he did approach the birth control officials and ask them for leniency not to abort the child because they wanted to have a son. And then the officials said to him, no. And I think that's in the record. He did approach one time, at least one time, they asked him to show some leniency to them because they didn't have a son. And also, I think the involuntary nature of the wife's sterilization is evident in the record because if you look at the timing of the sterilization, she underwent sterilization in August 2002, and the husband actually left China three months later. And at that time, she was already 44 years old. Again, no person, no woman in her right mind would undergo sterilization at that stage of her life and also when she knew that the husband was going abroad, leave the country. And also, addressing the ethnicity issue, Your Honor, I think the record does actually support the petitioner's position that is on page 199. According to the country report, it says that ethnic minorities persons who are government workers are coming under increasing pressure to adhere to the birth limits imposed on Han Chinese. And in this case, the record shows the husband, the petitioner, was working for a railway company. I think it's obvious that the Chinese government controls railway company. So he, in a sense, he's a government worker. So therefore, he's subjected to the same limitation as ethnic Han Chinese would be submitted to. So therefore, I think that's the argument in that regard. And it necessarily fails. Thank you, counsel. The case is arguably submitted. We'll take another brief recess where we set up a system for communication with a distant shore.
judges: Reinhardt, Brunetti, Thomas